1    WO

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE DISTRICT OF ARIZONA**

8

9    Walter L Cleveland, Jr.,                    No. CV-15-00400-TUC-BPV

10              Plaintiff,                        **FINDINGS OF FACT AND**
                                                  **CONCLUSIONS OF LAW**
11    v.

12   County of Cochise, et. al.,

13              Defendants.

14

15

16          Plaintiff Walter L. Cleveland, who is proceeding *pro se*, brings this action against:

17   (1) Cochise County, Arizona, for Cochise County Sheriff's Department; (2) Cochise

18   County Deputy Sheriff Troy Haymore; (3) Cochise County Deputy Sheriff Robin Cronin;

19   and (4) Cochise County Deputy Sheriff Marsha Callahan-English.  (*See* Pretrial Order,

20   (Doc. 27 at 1)).  Plaintiff's claims are based on 42 U.S.C. § 1983 for alleged violations of

21   his rights under the Fourth and Fourteenth Amendments of the United States Constitution

22   relating to use of excessive force, unlawful search, unlawful seizure, and placing

23   Plaintiff's life "at risk by withholding…" his blood pressure medication.  (*Id.*).  Plaintiff

24   also alleges state law claims of: false arrest; assault; and negligence with regard to his

25   blood pressure medication.  (*Id.* at 1−2).

26          In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties consented

27   to proceed before a United States Magistrate Judge to conduct any and all further

28   proceedings in this case, including trial and entry of a final judgment, with direct review

1  by the Ninth Circuit Court of Appeals if an appeal is filed.  (Doc. 19).

2  On June 13, 2016, the Court conducted a one-day bench trial in this action.  (*See*

3  Amended Minute Entry 6/13/16 (Doc. 30)).  At trial, Plaintiff was the only witness to

4  testify in his case-in-chief.  At the close of Plaintiff's evidence, counsel for Defendants

5  made an oral motion for judgment as a matter of law and the Court granted the motion

6  with regard to the excessive force claim only.[1]  (*Id.*).  Defendants then presented

7  testimony from the following witnesses:  Assistant Chief Artie Reid of the Willcox Rural

8  Fire Department and Defendant Cochise County Deputy Sheriffs Haymore, Cronin, and

9  Callahan-English.  (*Id.*).  No exhibits were admitted into evidence.  Nor did the parties

10  submit any stipulations of fact or uncontested issues.  (*See* Doc. 27 at 2).

11  The Court has heard and weighed the testimony presented at trial.  The Court has

12  observed the witnesses' demeanor at trial and has evaluated their candor and credibility.

13  Having considered the pleadings, testimony of the witnesses, and the Court's trial notes,

14  the Court makes the following Findings of Fact and Conclusion of Law in accordance

15  with Rule 52(a) of the Federal Rules of Civil Procedure.[2]

16  **I.   FINDINGS OF FACT**

17  To the extent that the Findings of Fact stated below are also deemed to be

---

[1]   At the close of Plaintiff's case-in-chief, counsel for Defendants requested judgment as a matter of law.  Because such a motion is available only with regard to jury trials, Defendants' motion is more appropriately considered as a motion for judgment on partial findings under Rule 52(c).  *See Ritchie v. United States,* 451 F.3d at 1022–23 (9th Cir. 2006); Fed.R.Civ.P. 50(a), 52(c).  Under Rule 52(c):

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed.R.Civ.P. 52(c).

The Court hereby amends the June 13, 2016 Order (Doc. 30) to reflect that: (1) Defendants' motion for judgment as a matter of law is construed as a motion for judgment on partial findings under Rule 52(c); and (2) the Court grants the motion with regard to Plaintiff's excessive force claim only.  The Court includes its findings of fact and conclusions of law with regard to the Rule 52(c) motion below.  *See* Fed.R.Civ.P. 52(c) ("A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).").

[2]   The Court has determined that it is not necessary for the parties to file proposed findings of facts and conclusions of law pursuant to LRCiv 52.1 of the Local Rules of the District of Arizona and dispenses with that requirement.

Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow.

At all relevant times, Plaintiff and his brother, Fred Cleveland, lived in homes located next to each other on the same property at or near Willcox, Arizona.  The property on which both homes are located is fenced with at least one gate leading to Plaintiff's residence. The fence is about 20 feet from Plaintiff's residence.  Late on the evening of August 7, 2015, Plaintiff set fire to a mattress and other household trash at his residence.   The fire was located inside the fence, approximately 10 feet in front of Plaintiff's residence.[3]

At approximately 11:18 p.m., on August 7, 2015, Deputy Haymore responded to Plaintiff's residence in response to a report of burning.  Upon arrival, he saw the fire in front of Plaintiff's residence.  He spoke to Fred Cleveland who said that Plaintiff had been drinking and had wanted to set a bonfire.

At Plaintiff's residence, Deputy Haymore saw Plaintiff standing on the other side of the fire.  When Deputy Haymore called out to him, Plaintiff went into his home saying something to the effect that he was not going to talk to the deputy.  Deputy Haymore stepped over a chain link fence which was a little lower than waist high so that he could make contact with Plaintiff.   After he knocked on the door, he heard the sound of someone pushing furniture around, and based on his training, he suspected that Plaintiff was barricading himself inside.  Due to safety concerns, Deputy Haymore retreated to the other side of the fence to wait for back-up to arrive.

Deputy Cronin arrived as back-up.  She spoke to Fred Cleveland who told her that Plaintiff, who had been drinking, wanted to set a bonfire which Fred did not want to do.  Fred Cleveland also told Deputy Cronin that Plaintiff was not supposed to be drinking per

---

[3] Plaintiff testified that the fire could have been within ten feet of his residence. Assistant Fire Chief Reid testified that the fire was located somewhere between 12 and 20 feet from the residence and approximately 7½ feet from a power pole.  Deputy Haymore testified that the fire was about 5 to 10 feet in front of the residence and Deputy Cronin testified that the fire was about 10 feet from the residence.  The evidence establishes that the fire was within close proximity to Plaintiff's home and a power pole.

a release order.  Deputy Cronin contacted the Willcox Jail and confirmed that Plaintiff was subject to conditions of release prohibiting alcohol.

Deputy Cronin and Deputy Haymore remained outside the fence and called for Plaintiff to come out so that they could talk to him.  After about 15 minutes, Plaintiff came out of his home.  He appeared intoxicated and very agitated, waving his arms and yelling to the effect that he: (1) did not want to speak to the deputies, (2) did not want to go to jail; and (3) was going to sue them.[4]  Plaintiff also admitted that he had started the fire.  Meanwhile, Assistant Chief Reid of Willcox Rural Fire Department arrived and worked to extinguish the fire with a garden hose.[5]

Eventually, Deputy Callahan-Enlgish, who at that time was acting as a senior night officer[6], was summoned to the scene by Deputy Cronin.  Upon Deputy Callahan-English's arrival, Plaintiff was standing outside the fence.[7]  Plaintiff continued to present as very agitated and upset, waving his arms and clenching his fists.  His speech was slurred and his eyes were blood shot.  All three deputies believed Plaintiff was intoxicated.[8]  When Deputy Callahan-English asked Plaintiff why he ran into the house earlier, he responded that he did so because he was not going back to jail.  He also stated

[4] Plaintiff informed the deputies that he previously sued Cochise County and received $250 and, now, he would sue for millions.

[5] This was not Assistant Chief Reid's first encounter with Plaintiff.  In the 18 months prior to this incident, Assistant Chief Reid had responded to Plaintiff's residence on two other occasions:  one involving a ceiling fire caused by Plaintiff's wood stove, and the other when Plaintiff was burning weeds too close to his home and without a permit.  During the weed-burning incident, Assistant Chief Reid told Plaintiff that he could not burn without a permit and he could not set a fire any closer than 50 feet to any structure. Plaintiff testified that Assistant Chief Reid never told him not to burn outside. Plaintiff's testimony is not inconsistent with Chief Reid's.

[6] Deputy Callahan-English has been a deputy sheriff since January 2006 and her responsibilities include being a canine handler.  Prior to working as a deputy sheriff, she worked as an animal control officer.

[7] Deputy Haymore testified that Plaintiff stepped over the fence at some point.

[8] Plaintiff testified that although he was not intoxicated, he had been drinking Everclear alcohol that day.  On August 7, 2015, Plaintiff told Deputies Haymore, Cronin and Callahan-English that he had been drinking. Fred Cleveland had also informed Assistant Chief Reid and Deputies Haymore, Cronin and Callahan-English that Plaintiff had been drinking alcohol.

that he had a loaded gun and if they came into the house to try to get him, he would shoot them.[9]

Plaintiff's behavior fluctuated from extreme agitation and yelling profanities at the deputies one minute, to becoming calm, then returning to an agitated state. Due to this behavior, Deputy Callahan-English inquired whether Plaintiff, in addition to being intoxicated, had any significant medical issues that she should know about. Plaintiff responded that he suffered from high blood pressure and high cholesterol.[10] Out of concern caused by what Deputy Callahan-English described as Plaintiff's "rollercoaster emotions" and "rollercoaster attitude" toward the deputies, she asked him whether it would be all right to have paramedics see him and she requested paramedics to respond to the scene.

Deputy Haymore was with Plaintiff while the paramedics attended to him. Although Plaintiff was not aggressive toward the paramedics, he was agitated and they had to tell him to calm down several times. Plaintiff told the paramedics that he had high blood pressure. The paramedics determined that Plaintiff's blood pressure was fine and informed Deputy Haymore that Plaintiff had no significant medical issues at that time and could be released to the deputies.

While Plaintiff was with the paramedics, Deputies Callahan-English and Cronin spoke with Fred Cleveland and his wife Denise. The Clevelands said that Plaintiff had been drinking and he was unpredictable when he was drinking. They also told the two deputies that Plaintiff had threatened their family and he had also threatened a juvenile named Gage[11], who was not related to the Clevelands, but who had been at their

---

[9] At trial, Plaintiff denied that he told the deputies that he had a loaded gun and would shoot at anyone who came inside to get him. Upon weighing the credibility of the witnesses as well as testimony about Plaintiff's demeanor during the incident and his threat earlier that night to shoot out his brother's window, discussed *infra*, the Court finds that Plaintiff did make such a threat.

[10] At the time of the incident, Plaintiff was taking two blood pressure medications, medication to treat high cholesterol, daily aspirin, and allergy medication.

[11] The deputies did not obtain Gage's full name.

residence.  They reported that Plaintiff had a BB gun and a machete.  They also told the deputies that Plaintiff threatened to shoot out a window of their home, and they were scared he would follow through on the threat because, on a previous occasion, he shot out the windows of a vehicle belonging to Fred.[12]  The Clevelands said that Plaintiff had anger issues and that he previously had spent time in prison in another state for slicing a man from his head to his shoulder.  The Clevelands warned the deputies to be careful if they arrested Plaintiff because he would cause problems.

Based on the information from Fred and Denise Cleveland, Deputy Callahan-English decided to arrest Plaintiff on charges of domestic violence/disorderly conduct and domestic violence/threatening or intimidating.  After Plaintiff finished with the paramedics, Deputy Callahan-English informed him he was under arrest.  She directed him to turn around and place his hands behind his back, at which point Plaintiff became upset, saying that he did not want to go to jail and did not want to leave his dogs.

Deputy Callahan-English told Plaintiff that she would be more than happy to make sure his dogs had food and water and that they would be cared for, but to turn around and put his hand behind his back.  Plaintiff said: "Okay", but did not turn around or place his hands behind his back[13] and, instead, began cursing at the deputies and yelling about suing them.  Deputy Callahan-English again directed Plaintiff to turn around and place his hands behind his back or he would be charged with resisting arrest.  Plaintiff then complied with her command.

---

[12] Plaintiff admitted during trial that in April 2014, he shot out the windows of Fred Cleveland's car over an argument about an electric bill.  Plaintiff testified that he later pled guilty to domestic violence/criminal damage.

[13] Plaintiff testified that he turned around and placed his hands behind his back on Deputy Callahan-English's first command to do so.  He also testified that he may have said that he did not want to leave his three dogs, which were in the house.  Although Plaintiff did not remember Deputy Callahan-English saying that she would feed and water the dogs, he did remember her saying that she was going to check on the dogs.  Plaintiff testified there was no need for the deputy to tend to the dogs because they already had food and water.  Assistant Chief Reid testified that he heard Plaintiff say he did not want to leave his dogs.  Assistant Chief Reid also heard Deputy Callahan-English offer to make sure the dogs were fed and watered, and he heard Plaintiff respond: "Okay."  Upon weighing the credibility of the witnesses, the Court credits Deputy Callahan-English's and Assistant Chief Reid's testimony.

1   Deputy Callahan-English understood Plaintiff saying "Okay" as his
2   "acquiescence" to her offer to look after the dogs.[14]  She went on to testify that Plaintiff
3   never told her not to check on the dogs.

4   Deputy Callahan-English and the paramedics, who she requested accompany her[15],
5   entered Plaintiff's home.  Deputy Callahan-English stood inside the doorway while the
6   paramedics tended to the dogs and obtained Plaintiff's blood pressure medication.
7   Deputy Callahan-English wanted Plaintiff's medication[16] because she intended to book
8   him into jail for the night and she was aware of the possibility that he may have to stay
9   there two or three days.  She wanted the medication at this time to avoid the need to
10  obtain permission later to re-enter the residence to obtain it.  Deputy Callahan-English
11  did not conduct a search of Plaintiff's residence and she and the paramedics were not
12  inside for an extended period of time.  However, while Deputy Callahan-English waited
13  for the paramedics, she observed in plain view near the front door where she stood, a
14  revolver-style handgun (later determined to be a $CO_2$ BB gun) and, across from her in
15  plain view near the television, she saw a large machete.

16  Deputy Callahan-English seized both weapons. She testified that she did so for
17  security reasons because Plaintiff's door did not secure well, because she was dealing
18  with a domestic violence issue, and because the area where Plaintiff's residence is located
19  has a high incidence of illegal immigrant traffic and drug smuggling.  Her intention was
20  to secure the weapons.  She did not intend to initiate any charges related to the weapons.
21  Later, Deputy Callahan-English made arrangements with Plaintiff's sister-in-law to care
22

---

23  [14] Deputy Callahan-English felt especially qualified to tend to the dogs based on
24  her experience as an animal control officer and canine handler.  In her experience, she
    has never had anyone tell her not to care for their animals.

25  [15] Deputy Callahan-English requested that the paramedics accompany her to
26  prevent any accusations that she stole something or did something that she should not
    have done.

27  [16] Although Deputy Callahan-English did not remember Plaintiff mentioning to
28  her that he was on medication, in her experience, people with high blood pressure and
    high cholesterol were on medication.  She testified that Plaintiff did not request that she
    get his medication.

for the dogs in the event Plaintiff remained in custody for more than a day.

While Deputy Callahan-English was storing the weapons in her vehicle, she was called over to Deputy Cronin's patrol car where Plaintiff, who was inside the car, was angry and yelling profanity and for the deputies to snap his neck. Inside Deputy Cronin's patrol car, Plaintiff was hitting his head against the partition dividing the back seat from the front seat, and he was also throwing his head backwards against the back seat, while screaming. Deputy Callahan-English told Plaintiff that she had secured his gun and machete, his dogs were fed and watered, and everything would be okay but he needed to stop resisting and calm down. She went on to tell him that if he would calm down, he would probably just spend the night in jail and be out the next day. Plaintiff continued yelling profanity at the deputies and yelling for them to snap his neck.

At one point, Deputy Haymore entered the patrol car to prevent Plaintiff from hurting himself. Deputy Haymore secured Plaintiff's head by placing his right arm around the back of Plaintiff's head and placing his left arm around Plaintiff's left cheek, ear and forehead to prevent Plaintiff from hitting his head on the partition or the back seat. Deputy Haymore did not initiate any pain compliance; instead, his intention was to prevent Plaintiff from harming himself. Deputy Cronin assisted Deputy Haymore by holding Plaintiff from the other side. Deputy Cronin used her body weight and placed her hand on Plaintiff's face to prevent him from hitting his head. She did not intend to cause Plaintiff pain. Plaintiff told the deputies that he was going to fake an injury in order to keep from going to jail.

Willcox Police Department ("WPD") was called to the scene. Deputies Haymore and Cronin decided to transfer Plaintiff to the WPD patrol vehicle because it was smaller and presented less of an opportunity for Plaintiff to injure himself. Plaintiff resisted transfer to the WPD vehicle by tucking his legs under the seat in Deputy Cronin's vehicle. Once outside Deputy Cronin's vehicle, Plaintiff kicked wildly and refused to comply with the deputies' commands, so the deputies took Plaintiff to the ground to

secure his legs.[17]   During this time, Plaintiff bit at Deputy Cronin's thigh.[18]   After her encounter with Plaintiff, Deputy Cronin had a bruise on her left forearm and an injured pinkie, both of which did not require medical attention.

The deputies eventually transferred Plaintiff to the WPD patrol car and transported Plaintiff to the Willcox detention center.   When Deputy Haymore went to remove Plaintiff from the vehicle, Plaintiff appeared unconscious and did not respond to his name, although he was breathing.   Plaintiff had blood on his head and shoulder.   Deputy Haymore called paramedics. After checking on Plaintiff, the paramedics informed Deputy Haymore that Plaintiff had been faking being unconscious and he was fine, but he should probably be seen at to the hospital anyway.   Plaintiff, who was on a gurney, was taken to the hospital where medical staff informed that Plaintiff's potassium was off[19] and that he should stay at the hospital for treatment to achieve a safe level of potassium.

Deputy Callahan-English informed her lieutenant that Plaintiff would be spending the night at the hospital to receive medical care.   The lieutenant then directed Deputy Callahan-English to cite and release Plaintiff, and to also obtain an emergency order of protection for Fred Cleveland and his family.   Deputy Callahan-English obtained the emergency order of protection and informed Plaintiff he was not to return to his residence and that if he needed items from there, he should contact the sheriff's department for assistance.   She stressed to Plaintiff that if he returned to his residence he might be arrested.[20]   At just before 4:00 a.m., after citing and releasing Plaintiff, Deputy Callahan-

---

[17] Plaintiff denies kicking at the deputies when he was outside the patrol vehicles. In light of Plaintiff's volatile behavior during the entire evening, the Court finds the deputies' version to be credible.

[18] The Court accepts as true Plaintiff's testimony that he does not have teeth.   The absence of teeth does not negate Deputy Cronin's testimony that Plaintiff used his mouth against her in a biting motion.

[19] On direct examination, Plaintiff testified that hospital staff determined that his potassium level was low.   On cross-examination, when Plaintiff was asked by way of a leading question, whether the doctor found he had no injuries but had "elevated potassium", Plaintiff answered, "Yes."

[20] Plaintiff testified that he did not remember being told he was not permitted to return to his residence or to call the sheriff's department if he needed anything from his

1   English left Plaintiff in the hospital's care.

2       Later at the hospital, Plaintiff indicated that he wished to refuse further treatment

3   so that he could return home.  When he encountered resistance from medical staff who

4   indicated he needed to stay until the IV bag was empty, he became angry, kicked a chair,

5   and spilled a container of urine.  Hospital staff contacted WPD, who took Plaintiff into

6   custody, apparently cited him for disorderly conduct, and transported him to a detention

7   facility where Plaintiff remained until the following day.

8       The following day, August 8, 2015, Plaintiff walked home after he was released

9   from the detention facility. At home, Plaintiff could not locate his blood pressure

10  medication.  He contacted the Cochise County Sheriff's Department and WPD, and both

11  denied having the medication.  Plaintiff also contacted hospital staff who denied having

12  the medication, but called in a prescription.  However, Plaintiff's pharmacy informed him

13  that his insurance declined the prescription because he had recently filled a prescription

14  for that medication.  Plaintiff then sought care at the hospital because his head was

15  pounding.  According to Plaintiff, when his blood pressure is up, his head feels like it is

16  going to explode.  At the hospital, Plaintiff's blood pressure was recorded at 189/122 and

17  he was informed that his blood pressure was high and that he was borderline for a stroke

18  or heart attack.

19      On August 8, 2015, Deputy Callahan-English received a call reporting that

20  Plaintiff had returned to his residence.  At approximately 7:30 to 8:00 p.m. that evening,

21  she drove to the property and met with Fred Cleveland who said that Plaintiff had been at

22  the residence since about 2:30 that afternoon.[21]  She subsequently spoke to Plaintiff, who

23  appeared sober and said he was sorry for what had happened the night before and that he

24  acts that way when he drinks.  Deputy Callahan-English's sergeant directed her to issue a

25  ticket through the court to avoid any further altercation.  She advised Plaintiff that just

26  because she was leaving did not mean that he would not be charged with violating the

27

28  home.  The Court finds Deputy Callahan-English's version to be credible.

[21] On August 8, 2015, Deputy Callahan-English came on duty at 4:00 p.m.

1    protective order.  Deputy Callahan-English returned Plaintiff's medication at that time.

2         Additionally, at some point on August 8, 2015, Plaintiff contacted the Cochise

3    County Sheriff's Department about the removal of his weapons.  He was informed that he

4    could pick up the weapons that day or wait until his court date.  Plaintiff opted to wait

5    until the court date because he was low on gas.  The weapons were returned to him on

6    August 12, 2015.  Plaintiff was not charged with any offense related to the weapons.

7         In September 2015, Plaintiff entered a guilty plea to reckless burning and to

8    disorderly conduct at the hospital, all arising from the incidents on August 7 and 8, 2015.

9    **II.    CONCLUSIONS OF LAW**

10        To the extent that any of the Findings of Fact contain or include conclusions of

11   law, they are incorporated by reference herein.

12        **A.    JURISDICTION**

13        Plaintiff has alleged claims under 42 U.S.C. § 1983 and Arizona law.  The Court

14   has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it arises under the

15   Constitution, Laws, or Treaties of the United States.  The Court also has supplemental

16   jurisdiction over Plaintiff's state law claims.  *See* 28 U.S.C. § 1367(a).

17        **B.    PLAINTIFF'S CLAIMS PURSUANT TO 42 U.S.C. § 1983**

18        Under § 1983, every person who, under color of state law, deprives any citizen of

19   the United States "of any rights, privileges, or immunities secured by the Constitution

20   and laws, shall be liable to the party injured . . . .'" 42 U.S.C. § 1983.   Here, Plaintiff

21   alleges that Defendants deprived him of his rights under the United States Constitution.

22   Thus, to prevail under §1983, Plaintiff must prove by a preponderance of the evidence

23   that Defendants acted under color of state law[22] and Defendants' acts  deprived Plaintiff

24   of his particular rights under the United States Constitution.  *See e.g. Pavao v. Pagay,*

25   307 F.3d 915, 919 (9th Cir. 2002) ("In a civil case under 42 U.S.C. § 1983, . . .  the

26

27        [22] "An individual acts under color of state law when he or she exercises power
     'possessed by virtue of state law and made possible only because the wrongdoer is
28   clothed with the authority of state law.'"  *Naffe v. Frey,* 789 F.3d 1030, 1036 (9th Cir.
     2015) (quoting *United States v. Classic,* 313 U.S. 299, 326 (1941)).  Here, the Defendants
     were acting under color of state law for purposes of § 1983.

1    plaintiff carries the ultimate burden of establishing each element of his or her claim. . . .")

2    (citing *Larez v. Holcomb,* 16 F.3d 1513, 1517 (9th Cir. 1994)).

3    Plaintiff must also demonstrate by a preponderance of the evidence that

4    Defendants' conduct was the actionable cause of Plaintiff's claimed injury.   *Harper v.*

5    *City of Los Angeles,* 533 F.3d 1010, 1027 (9th Cir. 2008) (citation omitted).   "To meet

6    this causation requirement, the plaintiff must establish both causation-in-fact and

7    proximate causation."  *Id.* (citation omitted); *see also Rizzo v. Goode,* 423 U.S. 362, 731-

8    73, 377 (1976) (to prevail, the plaintiff must demonstrate that he suffered a specific injury

9    as a result of specific conduct of a defendant and show some affirmative link between the

10   injury and that defendant's conduct.).

11   ## 1.   PLAINTIFF'S CLAIMS AGAINST DEFENDANT COCHISE COUNTY

12   A local government may not be held liable on a theory of *respondeat superior.*

13   *Gibson v. County. of Washoe, Nev*., 290 F.3d 1175, 1186 (9th Cir. 2002), *overruled on*

14   *other grounds by Castro v. County of Los Angeles,* __ F.3d __, 2016 WL 4268955, *11

15   (9th Cir. Aug. 15, 2016) (en banc)), (citing *Monell v. New York City Dep't of Soc. Servs.*,

16   436 U.S. 658, 694 (1978)).  Instead, "a local government may be held liable 'when

17   implementation of its official policies or established customs inflicts the constitutional

18   injury.'"   *Clouthier v. Cty. of Contra Costa,* 591 F.3d 1232, 1249 (9th Cir. 2010),

19   *overruled on other grounds by Castro,* __ F.3d __, 2016 WL 4268955, *6, (quoting

20   *Monell*, 436 U.S. at 708 (Powell, J. concurring)); *see also Price v. Sery,* 513 F.3d 962,

21   966 (9th Cir. 2008) (stating that plaintiffs may "establish municipal liability by

22   demonstrating that . . . the constitutional tort was the result of a longstanding practice or

23   custom which constitutes the standard operating procedure of the local government

24   entity.")  (internal quotations omitted).  Additionally, under certain circumstances a local

25   government may be held liable where, "through its omissions the [governmental entity] is

26   responsible for a constitutional violation committed by one of its employees. . . ."

27   *Gibson,* 290 F.3d at 1186 (citations omitted).  In establishing liability on this theory, the

28   plaintiff must prove that the governmental entity's deliberate indifference led to its

omission and that the omission caused the employee to commit the constitutional violation) *overruled on other grounds by Castro,* __ F.3d. __, 2016 WL 4268955 at *11-*12 (holding that objective standard is used to establish deliberate indifference and overruling *Gibson* to the extent that it suggested otherwise).

Plaintiff has not established that Defendant Cochise County maintained a policy, practice or custom that resulted in the constitutional deprivations of which he claims. Nor has he established that Cochise County, through its omissions, is responsible for a constitutional violation committed by one of its employees. Consequently, judgment is entered in favor of Defendant Cochise County with regard to Plaintiff's § 1983 claim.

### 2.    DETENTION AND ARREST

The Fourth Amendment to the United States Constitution "protects the right to be free from 'unreasonable searches and seizures[.]'" *Davis v. United States,* 564 U.S. 229, 231 (2011); *see also McKenzie v. Lamb,* 738 F.2d 1005, 1007 (9th Cir. 1984) (the Fourth Amendment is made applicable to the states through the Fourteenth Amendment). Nonetheless, the Supreme Court "has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further" without violating the Fourth Amendment. *Hiibel v. Sixth Judicial Dist. Court of Nevada,* 542 U.S. 177, 185 (2004); *see also Terry v. Ohio,* 392 U.S. 1 (1963). Reasonable suspicion requires the officer to identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21 (footnote omitted). When determining whether an officer had reasonable suspicion to perform an investigatory detention, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez,* 449 U.S. 411, 417 (1981).

Additionally, "[t]he [F]ourth [A]mendment . . . prohibits arrests without probable cause." *McKenzie,* 738 F.2d at 1007 (citing *Beck v. Ohio,* 379 U.S. 89, 90–91 (1964)). Under the Fourth Amendment, a warrantless arrest  such as that which occurred in

Plaintiff's case, "'requires probable cause,' which 'exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested.'" *Sialoi v. City of San Diego,* 823 F.3d 1223, 1232 (9th Cir. 2016) (quoting *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007)). "Because the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." *Edgerly v. City & Cty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010). Whether probable cause to arrest exists depends "on the totality of facts" available to the officers. *Sialoi,* 823 F.3d at 1232 (internal quotation marks and citation omitted).

When Deputy Haymore responded to the scene after having received a report about the fire, he spoke to Fred Cleveland who said that Plaintiff, who was his brother, had wanted to set a bonfire. Deputy Haymore saw Plaintiff standing at the fire in front of his residence where a mattress and other household debris were burning.[23] That fire, which was inside the fence surrounding both Plaintiff's and Fred Cleveland's homes, was in close proximity to Plaintiff's home as well as to a power pole. When Deputy Haymore called out to Plaintiff, Plaintiff retreated into his home saying he did not want to talk to the deputy. When Deputy Callahan-Enlgish arrived, Plaintiff was standing outside the fence carrying on in an agitated state. Deputy Callahan-English ultimately placed Plaintiff under arrest for domestic violence/disorderly conduct[24] and domestic

---

[23] Defendants have not cited any particular statutes with regard to reckless burning or burning without a permit. In Arizona, "[a] person commits reckless burning by recklessly causing a fire or explosion which results in damage to an occupied structure, a structure, wildland or property." A.R.S. § 13-1702(A). Reckless burning is a class 1 misdemeanor. A.R.S. § 13-1702(B). At least one Arizona statute prohibits certain types of open fires, discusses the issuance of open burning permits, and provides that first time violators will be subject to a civil penalty. A.R.S. § 49-501.

[24] Under Arizona law, in pertinent part:
A person commits disorderly conduct if, with intent to disturb the peace or quiet of a neighborhood, family or person, or with knowledge of doing so, such person:
    1. Engages in fighting, violent or seriously disruptive behavior; or
    2. Makes unreasonable noise; or
    3. Uses abusive or offensive language or gestures to any person present in a manner likely to provoke immediate physical retaliation

- 14 -

1    violence/threatening or intimidating[25].

2            Plaintiff admitted setting the fire in front of his home and on the property he

3    shared with his brother's family.   Plaintiff appeared intoxicated to the deputies and

4    Assistant Chief Reid, he admitted to drinking and he was agitated when talking to the

5    deputies, demonstrated by waiving his arms, clenching his fists, and using profanity.

6    Fred and Denise Cleveland reported that Plaintiff had been drinking and that he was

7    unpredictable when drinking.   He threatened to shoot out the window of their home and

8    they were afraid for their safety, especially given that on a previous occasion, Plaintiff

9    shot out the windows of Fred's car and had served prison time for cutting another man.

10   They reported that Plaintiff had a BB gun and a machete.   The Clevelands' reports of

11   threats are consistent with Plaintiff's behavior toward the deputies, including his threat to

12   shoot them if they came into the house to get him.   The Court concludes that the

13   Defendant deputies had reasonable suspicion to detain Plaintiff and their arrest of

14   Plaintiff based on charges of domestic violence/disorderly conduct and domestic

15   violence/threatening or intimidating was supported by probable cause.

16

17   _____
     by such person;
     * * *
18   6. Recklessly handles, displays or discharges a deadly weapon or
     dangerous instrument.
19   A.R.S. § 13-2904(A).   Such offense involves domestic violence when the victim is
     related to the defendant.  A.R.S. § 13-3601(A)(1), (4).

20   [25] Under Arizona law:
21   A person commits threatening or intimidating if the person threatens or
     intimidates by word or conduct:
22           1. To cause physical injury to another person or serious damage to
             the property of another; or
23           2. To cause, or in reckless disregard to causing, serious public
             inconvenience including, but not limited to, evacuation of a building,
24           place of assembly or transportation facility; or
25           3. To cause physical injury to another person or damage to the
             property of another in order to promote, further or assist in the
26           interests of or to cause, induce or solicit another person to participate
27           in a criminal street gang, a criminal syndicate or a racketeering
             enterprise.
28   A.R.S. § 13-1202(A).   Such offense involves domestic violence when the victim is
     related to the defendant.  A.R.S. § 13-3601(A)(1), (4).

### 3.      EXCESSIVE USE OF FORCE

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton,* __ U.S. __, 134 S.Ct. 1861, 1865 (2014) (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989)); *see also Smith v. City of Hemet,* 394 F.3d 689,700−01 (9th Cir. 2005); *Pierce v. Multnomah County, Or.,* 76 F.3d. 1032, 1042–43 (9th Cir. 1996) (holding that "[t]he Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest.").  The inquiry into whether the Fourth Amendment right against unreasonable seizures was violated "requires balancing 'the nature and quality of the intrusion' on a person's liberty with the 'countervailing governmental interests at stake' to determine whether the use of force was objectively reasonable under the circumstances [confronting the officers]." *Smith,* 394 F.3d at 701 (quoting *Graham,* 490 U.S. at 396); *see also Tolan,* __ U.S. at __, 134 S.Ct. at 1865−66.  The Ninth Circuit "undertake[s] this inquiry with great caution, making 'allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'"  *Marquez v. City of Phoenix,* 693 F.3d 1167, 1174 (9th Cir. 2012) (quoting *Graham*, 490 U.S. at 396−97).

The Supreme Court has indicated that relevant factors in the reasonableness inquiry include, but are not limited to: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Smith,* 394 F.3d at 701 (citing *Graham,* 490 U.S. at 396).  Additionally, although the existence of less forceful options to capture or subdue a suspect "is relevant, '[p]olice officers . . . are not required to use the least intrusive degree of force possible.'" *Marquez,* 693 F.3d at 1174 (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir.1994)). The Ninth Circuit applies *Graham* "by first considering the nature and quality

1    of the alleged intrusion. . . ." *Mattos v. Agarano,* 661 F.3d 433, 441 (9th Cir. 2011)

2    (citation omitted).

3    With regard to Defendants' Rule 52(c) motion, at the close of Plaintiff's case, the

4    evidence established that after Plaintiff, who had been drinking and presented as

5    intoxicated, had been placed under arrest, handcuffed and escorted to the patrol car, he

6    began to hit his head against the back of the seat and partition between the front and back

7    seats because he felt that he should have been issued a citation instead of being arrested.

8    He testified that two of the deputies got into the patrol car with him and held his head to

9    prevent him from hurting himself.  He admitted that when the deputies attempted to

10   transfer him to the WPD patrol car, he put his feet under the seat of the Deputy Cronin's

11   patrol car to prevent the transfer.  He admitted that once inside the WPD patrol car, he

12   continued to hit his head on the back of the seat.  Upon arriving at the jail, he appeared

13   unconscious and was ultimately taken to the hospital where the doctor found he had no

14   injuries, but his potassium level was off.

15   As to the nature and quality of the force used by the deputies, Plaintiff's evidence

16   does not remotely suggest the amount of force used or that it was excessive.  With regard

17   to the severity of Plaintiff's crimes, as discussed earlier, the deputies had probable cause

18   to arrest Plaintiff for domestic violence/disorderly conduct and domestic

19   violence/threatening or intimidating.  Given that Plaintiff's threats against his brother

20   involved use of a weapon, the charges were serious, especially in light of the fact that

21   Plaintiff previously had exhibited similar conduct directed at his brother by shooting out

22   the windows of his brother's vehicle.  Turning to the governmental interests at stake,

23   Plaintiff conceded that he was hitting his head against the back seat and partition between

24   the seats and that he resisted the deputies' efforts to remove him from the patrol car by

25   tucking his legs under the seat.  Here, there were significant governmental interests that

26   could lead an objectively reasonable officer in the same situation to believe that the force

27   used with Plaintiff was justified given that the deputies had good reason to believe that

28   allowing Plaintiff to continue hitting his head against the seat and partition in the patrol

car would create a serious harm to himself.   Moreover, although Plaintiff testified that two of the deputies held his head to prevent him from hitting it back and forth in the patrol car, his testimony does not suggest that the deputies employed any more force than that which was reasonably necessary to prevent him from harming himself. "Not every push or shove . . ." in the course of making an arrest amounts to a constitutional violation. *Graham,* 490 U.S. at 396.  Defendants' oral motion for judgment as a matter of law, which is construed as a motion for judgment on partial findings is well taken. Therefore, Defendants are entitled to judgment on partial findings in their favor pursuant to Rule 52(c).

Moreover, consideration of all the evidence presented at trial also supports a judgment in the Defendant deputies' favor.  Here, Plaintiff's own actions in an attempt to injure himself in order to protest his arrest and to support a law suit precipitated any use of force.  Deputy Haymore described the manner in which he used his arms to brace Plaintiff from hitting himself against the front partition and back seat of the patrol car. Deputy Cronin also used her body weight to assist Deputy Haymore to keep Plaintiff from flinging himself back and forth in the patrol car.  Deputy Haymore stressed that he did not attempt any pain compliance.  When Plaintiff was removed from Deputy Cronin's patrol car for transfer to the smaller WPD car for Plaintiff's safety, Plaintiff at first resisted and then began kicking at the deputies who took him to the ground to secure his legs. Although, upon arrival at the detention center, Plaintiff had blood on his head and shoulders, there is no evidence that the bleeding was caused by the deputies' use of force as opposed to Plaintiff's own efforts to injure himself.  The evidence supports the finding that the deputies used no more force than was reasonably necessary to restrain Plaintiff and to keep Plaintiff from harming himself or the deputies.

### 4.   ENTRY INTO PLAINTIFF'S HOME AND SEIZURE OF WEAPONS AND MEDICATION

Because the evidence establishes that Deputy Callahan-English is the only named Defendant to have entered Plaintiff's home and seized the items at issue, judgment is

entered in favor of Defendants Haymore and Cronin on this issue. *See Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir. 1998) ("Liability under § 1983 must be based on the personal involvement of the defendant.").

It is well-settled that under the Fourth Amendment, searches and seizures inside a home without a warrant or consent are presumptively unreasonable, subject to a few specific and well delineated exceptions. *See Groh v. Ramirez,* 540 U.S. 551, 559 (2004); *United States v. Shaibu,* 920 F.2d 1423, 1425 (9th Cir. 1990); *Sialoi,* 823 F.3d at 1237; *Miranda v. City of Cornelius,* 429 F.3d 858, 865 (9th Cir. 2005).

### a.    ENTRY INTO PLAINTIFF'S HOME

Defendants rely exclusively on Plaintiff's consent to justify Deputy Callahan-English's warrantless entry into Plaintiff's home.  "Consent must be 'unequivocal and specific' and 'freely and intelligently given.'"  *Shaibu,* 920 F.2d 1423, 1426 (9th Cir. 1990)  (citation omitted).  Further, a "failure to object to the entry[]" does not establish consent. *Id.* at 1427.  *Cf. United States v. Gilbert,* 774 F.2d 962, 964 (9th Cir. 1985) (request that officers retrieve clothing from home amounts to consent).  In a § 1983 action, "[P]laintiff carries the ultimate burden of establishing . . . lack of consent." *Pavao,* 307 F.3d at 919 (citation omitted).

Plaintiff told Deputy Callahan-English that he did not want to go to jail because he did not want to leave his dogs. Deputy Callahan-English said that she would be more than happy to make sure that Plaintiff's dogs had food and water and would be cared for, and for Plaintiff to turn around and put his hands behind his back, to which Plaintiff responded, "Okay."  Plaintiff did not turn around or place his hands behind his back, but instead, started yelling again, using profanity, about suing the Deputies.  Assistant Chief Reid also heard Plaintiff say "Okay" when Deputy Callahan-English offered to make sure Plaintiff's dogs were fed and watered. Deputy Callahan-English testified that she understood Plaintiff saying "Okay" as "acquiescence" to her offer to look after the dogs.

The Court is mindful that "[t]he existence of consent to a search is not lightly to be inferred…."  *Shaibu,* 920 F.2d at 1426 (internal quotation marks and citation omitted).

1   Plaintiff was concerned about leaving his dogs.  Plaintiff testified that the dogs were in

2   his home. While Deputy Callahan-English did not specifically request consent to enter

3   Plaintiff's home, she clearly indicated that she would make sure the dogs had food and

4   water.  Plaintiff said "Okay" in response to a compound series of statements from Deputy

5   Callahan-English, first regarding her offer to care for the dogs and second regarding her

6   request that he turn around and place his hand behind his back.  Although Plaintiff said

7   "Okay", he did not turn around and he did not put his hands behind his back.  Instead, he

8   started yelling again about suing the deputies. Given Plaintiff's refusal to comply with

9   Deputy Callahan-English's command, Plaintiff's "Okay" could only have been in

10  response to her offer to look after the dogs.    Accordingly, Deputy Callahan-English's

11  entry into Plaintiff's home was lawful because she had his consent to go inside.

12                        **b.    SEIZURE OF THE WEAPONS**

13          Under the Fourth Amendment, "[a] seizure results if 'there is some meaningful

14  interference with an individual's possessory interests in that property.'"  *Miranda,* 429

15  F.3d at 862 (quoting *Soldal v. Cook County,* 506 U.S. 56, 61 (1992); *see also Lavan v.*

16  *City of Los Angeles,* 693 F.3d 1022, 1028-29 (9th Cir. 2012) ("'[T]he Fourth Amendment

17  protects against unreasonable interferences in property interests regardless of whether

18  there is an invasion of privacy.'" (quoting *Miranda,* 429 F.3d at 862).

19          Once inside Plaintiff's home, Deputy Callahan-English saw the BB gun and

20  machete in plain view and took them.  Under the plain view doctrine, "a law enforcement

21  officer may seize items found in 'plain view[]'" where the officer had a legal right to be

22  at the location from which the object was plainly viewed and the object's incriminating

23  character is immediately apparent.  *United Sates v. Bulacan,* 156 F.3d 963, 968 (9th Cir.

24  1998) (citing *Horton v. California,* 496 U.S. 128, 136-137, (1990)).  "The plain view

25  doctrine 'merely reflects an application of the Fourth Amendment's central requirement

26  of reasonableness to the law governing seizures of property.'"  *Soldal,* 506 U.S. at 66

27  (quoting *Texas v. Brown,* 460 U.S. 730, 739 (1983), *abrogated on other grounds by*

28  *Horton,* 469 U.S. 128)).

By the time Deputy Callahan-English saw the weapons in plain view, she had consent to be in Plaintiff's home, and the Clevelands had already reported that earlier that evening Plaintiff had threatened their family and had threatened to shoot out the window of their home, which was located just next door to Plaintiff's home. Based on the Clevelands' statements, Deputy Callahan-English had placed Plaintiff under arrest for, domestic/violence disorderly conduct and domestic violence/threatening or intimidating. Deputy Callahan-English was also aware from the Clevelands' statements that Plaintiff had used his gun to shoot out Fred's car windows on a previous occasion and that he had served time in prison for cutting a man. The weapons certainly constituted incriminating evidence, establishing that Plaintiff had the means and opportunity to make good on his threats against the Clevelands. On the instant evidence, the seizure of the gun and machete were justified under the plain view doctrine.

Additionally, Arizona's domestic violence statute also permits officers responding to a domestic violence situation to seize a firearm:

> On learning or observing that a firearm is present on the premises, the peace officer may temporarily seize the firearm if the firearm is in plain view or was found pursuant to a consent to search and if the officer reasonably believes that the firearm would expose the victim or another person in the household to a risk of serious bodily injury or death.

A.R.S. § 13-3601(C). The statute prescribes specific procedures for seizure of a firearm as follows:

> If a firearm is seized pursuant to subsection C of this section, the peace officer shall give the owner or possessor of the firearm a receipt for each seized firearm. The receipt shall indicate the identification or serial number or other identifying characteristic of each seized firearm. Each seized firearm shall be held for at least seventy-two hours by the law enforcement agency that seized the firearm.

A.R.S. § 13-3601(D). Further, if a firearm is seized pursuant to subsection C, the victim shall be notified by a peace officer before the firearm is released from temporary custody. A.R.S. § 13-3601(E).

Under Arizona law, a "firearm" is "any loaded or unloaded handgun, pistol, revolver, rifle, shotgun or other weapon that will or is designed to or may readily be converted to expel a projectile by the action of expanding gases, except that it does not

include a firearm in permanently inoperable condition." A.R.S. § 13-105(19). Plaintiff testified that Deputy Callahan-English took his $CO_2$ BB gun. Plaintiff's $CO_2$ BB gun meets the definition of a firearm. *See e.g., State v. Cordova,* 198 Ariz. 242, 242, 8 P.3d 1156, 1157 (App. 1999) (relying on §13-105's definition of a firearm when holding that a carbon dioxide powered pellet gun constituted a deadly weapon because it was a firearm, noting that "'[a] carbon dioxide powered gun expels a projectile by the action of an explosive or the expansion of gas.'") (quoting *Commonwealth v. Sterling,* 344 Pa.Super. 269, 496 A.2d 789, 792 (1985)).

Here, in compliance with A.R.S. § 13-3601(C), Deputy Callahan-English was legally inside Plaintiff's home based upon his consent and the gun was in plain view. When Deputy Callahan-English seized the gun, she was aware that earlier that evening Plaintiff threatened to shoot out the window of his brother's home, which was located next to Plaintiff's home, and that Plaintiff had, in the past, shot out the windows of his brother's vehicle. Fred Cleveland and his wife had reported to Deputy Callahan-English that Plaintiff was prone to violence and she also knew that the Clevelands feared for their safety. She also anticipated that Plaintiff may be returning to his home in less than 24 hours after spending the night in jail. After seizing the gun and storing it in her car, Deputy Callahan-English informed Plaintiff she had taken it and the machete. Thus, there is no question that Plaintiff had notice that the items had been seized. Ultimately, the gun was not released to Plaintiff until August 12th–more than 72 hours after it was seized. In light of the evidence presented and the Court's conclusion that the seizure was lawful under the Fourth Amendment's plain view doctrine, the seizure of Plaintiff's BB gun was arguably permissible under subsection C of Arizona's domestic violence statute, as well. *Cf. Miranda,* 429 F.3d at 865 ("'The question…upon review of a state- approved search or seizure is not whether the search (or seizure) was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment.'") (quoting *Sibron v. New York,* 392 U.S. 40, 61 (1968)).

Because the seizure of the gun and machete in this case fell within the Fourth

1    Amendment's plain view doctrine, Plaintiff's constitutional rights were not violated.

2                        c.    **SEIZURE OF THE MEDICATION**

3        Seizure of the medication implicates the Fourth and Fourteenth Amendments.  As

4    to Fourth Amendment concerns, Deputy Callahan-English took Plaintiff's medication not

5    as incriminating evidence, but to have it available for Plaintiff while he was in jail.  When

6    Deputy Callahan-English took the medication, Plaintiff had already been placed under

7    arrest and she intended for him to spend at least the night in jail.  She also anticipated he

8    could be detained beyond that night.

9        Although Deputy Callahan-English was lawfully inside Plaintiff's home based

10   upon his consent, seizure of the medication deprived Plaintiff of a meaningful possessory

11   interest in that property.  *See e.g. Soldal,* 506 U.S. at 69.  The question then becomes

12   whether the seizure was reasonable under the Fourth Amendment.  *See Lavan,* 693 F.3d

13   at 1030.  While Deputy Callahan-English's decision to take the medication was made for

14   Plaintiff's best interest to ensure that it was available to him while he was incarcerated,

15   she also testified that she took the medication to avoid having to get consent to return to

16   get it later if Plaintiff needed it.  Defendants have not argued that the evidence supports

17   any basis on which the Court could conclude that the seizure comports with the Fourth

18   Amendment.  Although Deputy Callahan-English had consent to be in Plaintiff's home,

19   and despite her well-intentioned reason for taking the medication, there is no showing

20   that she had consent to take the medication or that taking it was justified under any of the

21   exceptions to the Fourth Amendment for warrantless seizures.  The Court is constrained

22   by Fourth Amendment jurisprudence to conclude that the removal of the medication from

23   Plaintiff's home violated the Fourth Amendment's proscription against unreasonable

24   seizures of property. Plaintiff is entitled to judgment in his favor on this claim.

25       With regard to the Fourteenth Amendment, "although the Constitution protects a

26   citizen's liberty interest in [his] own bodily security, *see, e.g., Youngberg v. Romeo*, 457

27   U.S. 307, 316–17, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the state's failure to protect that

28   interest does not violate the Fourteenth Amendment, unless one of two exceptions

applies: (1) the special relationship exception, or (2) the state-created danger exception." *Campbell v. State of Washington Dep't of Soc. & Health Servs.*, 671 F.3d 837, 842 (9th Cir. 2011) (citing *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189 (1989); *Patel v. Kent Sch. Dist.*, 648 F.3d 965 (9th Cir. 2011)).

> The special-relationship exception applies:
> when 'the State takes a person into its custody and holds him there against his will.' *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. 998 (emphasis added). "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause. . . ." *Id.* at 200, 109 S.Ct. 998. In such a situation, the state has a duty to "assume some responsibility for [the person's] safety and general well-being" because it has "render[ed] him unable to care for himself." *Id.* at 200, 109 S.Ct. 998.

*Campbell,* 671 F.3d at 842–43 (9th Cir. 2011).   Importantly, "[t]he special-relationship exception does not apply when a state fails to protect a person who is not in custody." *Patel,* 648 F.3d at 972.  Although Plaintiff was in custody when Deputy Callahan-English took his medication, he was later released from custody at the hospital so that he could receive medical care.   Later, on August 8, 2015, Plaintiff was able to return to the hospital for care where, the Court infers Plaintiff received necessary care including administration of medication if needed.   "In the special relationship situation, the state's affirmative duty to protect arises from the limitation the state has imposed on the person's freedom to act for himself; the duty does not arise 'from the State's knowledge of the individual's predicament or from [the State's] expressions of intent to help.'" *Campbell,* 671 F.3d at 843. (citing *DeShaney,* 498 U.S. at 200)  Plaintiff has not established that the special-relationship exception applies to his case.

Turning to the state-created danger exception, Plaintiff must establish "'affirmative conduct on the part of the state in placing [him]…in danger. . .'" and that Deputy Callahan-English acted with "'deliberate indifference' to a 'known or obvious danger.'"  *Patel,* 648 F.3d at 974 (quoting *Munger v. City of Glasglow Police Dep't.,* 227 F.3d 1082, 1086 (9th Cir. 2000); *L.W. Grubbs,* 92 F.3d 894, 900 (9th Cir. 1996)).  The

Court need not reach "the first requirement here because [Plaintiff] fails on the second." *Patel,* 648 F.3d at 974.  "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Id.* (quoting *Board of Comm'rs. of Bryan Cnty. v. Brown,* 520 U.S. 397, 410 (1997)). Here, Plaintiff must prove that Deputy Callahan-English must have recognized an "unreasonable risk and actually intend[ed] to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'. . . In other words, the defendant 'knows that something *is* going to happen but ignores the risk and exposes [the plaintiff] to it.'" *Id.* (emphasis in original) (quoting *Grubbs,* 92 F.3d at 899–900).  "[A] lapse in judgment . . ." is not enough to meet the standard.  *Id.* at 976.

Deputy Callahan-English took the medication because she foresaw the risk that Plaintiff might have needed his medication while incarcerated and that he might have been incarcerated for longer than just overnight.  When she took the medication, the paramedics had cleared Plaintiff.  She had no reason to anticipate that Plaintiff was going anywhere but the jail.  However, at the jail, Plaintiff appeared unconscious and although paramedics again cleared him, he was ultimately taken to the hospital where he was cited and released from custody to remain at the hospital for medical care.  Because an order of protection had been issued, Plaintiff was not legally permitted to return to his home after the hospital released him.

Deputy Callahan-English had no way of knowing when she took the medication that Plaintiff was not going to be incarcerated at the jail overnight.  Nor did she know, after leaving him at the hospital, that he would demand release from the hospital against the recommendation of medical staff, and that he would be arrested by WPD and taken into custody.  While Deputy Callahan-English arguably should have realized that she still possessed the medication when she left Plaintiff in the hospital's care, the evidence simply does not support the finding that she "'actually intend[ed] to expose the plaintiff to such risks [of being without his medication] without regard to the consequences to Plaintiff.'"  *Id.* (quoting *Grubbs,* 92 F.3d at 899).   Instead, she decided to take the

1    medication from Plaintiff's home to ensure that Plaintiff would have it while he was

2    incarcerated if and when he needed it.   If Deputy Callahan-English had intended to

3    deprive Plaintiff of medication, she certainly would not have left him in care of medical

4    staff at the hospital.   That it was not Deputy Callahan-English's intention to expose

5    Plaintiff to the risk of being without his medication is further established by the fact that

6    she brought the medication to Plaintiff's home on August 8th after learning that Plaintiff

7    was there.   Because the evidence does not support liability under the state-created danger

8    exception, there is no violation under the Fourteenth Amendment Due Process Clause.[26]

9                                **d.    DAMAGES**

10         Plaintiff has not established any actual damages resulting from violation of his

11   constitutional rights under the Fourth Amendment with regard to seizure of his

12   medication.   Although Plaintiff claims he suffered a pounding headache and high blood

13   pressure as a result of being without his medication for less than 16 hours[27] on August

14   8th, Plaintiff has not established that his headache was caused from lack of medication as

15   opposed to his having been heavily intoxicated the night before or having voluntarily hit

16   his head repeatedly against the partition and back seat in the patrol car.   Nor did Plaintiff

17   establish how often he must take his medication or that his high blood pressure reading

18   on August 8th was caused by not having his medication.

19         Regardless, in the Ninth "Circuit, nominal damages must be awarded if a plaintiff

20   proves a violation of his constitutional rights." *George v. City of Long Beach,* 973 F.2d

21   _____

22   [26] The Ninth Circuit recently held that a pre-trial detainee advancing a failure to
     protect claim did not have to prove the "subjective elements about the officer's actual
23   awareness of the level of risk." *Castro* _ F.3d _, 2016 WL4268955 at *7 (re-stating test
     in light of *Kingsley v. Hendrikson,* _ U.S. _, 135 S.Ct. 2466 (2015)).   To any extent that
24   *Castro* could be applicable to claims of state-created danger, the conclusion here would
     not change.   Under *Castro,* a reasonable officer in Deputy Callahan-English's
25   circumstances would not have foreseen that Plaintiff would not have been incarcerated at
     the jail at least overnight.

26   [27] After arrest, Plaintiff was ultimately taken to the hospital where he received
     medical treatment until WPD took him to the detention center on other charges.
27   According to Fred Cleveland's report to Deputy Callahan-English, Plaintiff returned
     home on August 8th at approximately 2:30 p.m.   At some point thereafter, Plaintiff
28   sought treatment at the hospital.   Deputy Callahan-English returned the medication to
     Plaintiff at approximately 7:30 to 8:00 p.m. that evening.

706, 708 (9th Cir. 1992); *see also Hazel v. Crofoot,* 727 F.3d 983, 991–94 (accord); *Larez,* 946 F.2d at 640 ("freedom from unreasonable searches and seizures…" falls within those rights which are actionable for nominal damages without proof of actual injury. This is because "[n]ominal damages are a purely 'symbolic vindication of [a] constitutional right,' and are awarded regardless of' whether 'the constitutional violation causes any actual damage.'" *Schnieder v. County of San Diego,* 285 F.3d 784, (9th Cir. 2002) (quoting *George,* 973 F.2d at 708). "Nominal damages, as the term implies, are in name only and customarily are defined as a mere token or 'trifling'." *Cummings v. Connell,* 402 F.3d 936, 943 (9th Cir. 2005) (*quoting Carey v. Piphus*, 435 U.S. 247, 267 (1978)) (other citations omitted). Although the amount of nominal "damages awarded is not limited to one dollar, the nature of the award compels that the amount be minimal." *Id.* (citations omitted).

Under the instant circumstances, where Plaintiff has failed to establish actual damages, Plaintiff is entitled to nominal damages in the amount of one dollar.

### C.   PLAINTIFF'S STATE LAW CLAIMS

#### 1.   FALSE ARREST

"Under Arizona law, probable cause is an absolute defense to a claim of false arrest and imprisonment." *Gasho v. United States,* 39 F.3d 1420, 1427 (9th Cir. 1994) (citing *Hockett v. City of Tucson,* 139 Ariz. 317, 320, 678 P.2d 502, 505 (Ct.App.1983)). As discussed, *supra,* the deputies had probable cause to arrest Plaintiff. Moreover, the evidence presented at trial supports the conclusion that the deputies' actions leading up to the development of probable cause were lawful. *Cf. George,* 973 F.2d at 710 (even though probable cause existed for arrest, plaintiff still established claim of false arrest and imprisonment where the warrantless arrest in his home was unlawful under both federal and state law). Consequently, judgment is entered in favor of Defendants with regard to Plaintiff's claim for false arrest under Arizona law.

#### 2.   ASSAULT

To prevail on a claim of assault, Plaintiff must prove by a preponderance of the

1    evidence that Defendants "acted 'with intent to cause another harmful or offensive

2    contact or apprehension thereof, and the other person apprehend[ed] imminent contact.'"

3    *A.G. v. Paradise Valley Unified Sch. Dist. No. 69,* 815 F.3d 1195, 1209 (9th Cir. 2016)

4    (quoting *Garcia v. United States*, 826 F.2d 806, 809 n. 9 (9th Cir.1987) (citing

5    Restatement (Second) of Torts § 21)) (applying Arizona law).  Contact is offensive if it

6    "offends a reasonable sense of personal dignity." Restatement (Second) of Torts § 19

7    (1965).

8           Plaintiff has not specified which actions form the basis of his assault claim, nor

9    did he present evidence that the deputies intended him harmful contact or that he was in

10   apprehension of same.  Moreover, the evidence supports the conclusion that any threats

11   by the officers involved the threat to charge Plaintiff with resisting arrest if he did not

12   comply with the deputies' commands to turn around and place his hands behind his back.

13   Under Arizona law, "[t]hreatening or using physical force in making an arrest is justified

14   as long as (1) a reasonable person would believe that such force is immediately necessary

15   to effect the arrest; (2) such person makes known the purpose of the arrest or believes that

16   it is otherwise known or cannot reasonably be made known to the person to be arrested;

17   and (3) a reasonable person would believe the arrest to be lawful. A.R.S. § 13–409."

18   *Ekweani v. Maricopa County Sherrif's Office,* 2010 WL 2079773 at *7 (D. Ariz. May 24,

19   2010) (citing A.R.S. § 13-409).  Defendants bear the burden of establishing application of

20   Arizona's justification statute by a preponderance of the evidence.  *See Pfeil v. Smith,*

21   183 Ariz. 63, 65, 900 P.2d 12, 14 (Ariz.App. 1995) (citations omitted).  Here, Plaintiff

22   testified that he was informed that he was being arrested for disorderly conduct among

23   other things, and the Court has determined, as discussed above, that the arrest was lawful.

24   In light of the evidence presented at trial, the Court concludes that during the encounter

25   any threats or force, as discussed above with regard to Plaintiff's excessive force claim,

26   were reasonable in the course of making the arrest.  Because Defendants' conduct was

27   justified, they are not subject to civil liability.  *See id.* (citing A.R.S. §13-413 ("No person

28   in this state shall be subject to civil liability for engaging in conduct otherwise justified

pursuant to the provisions of this chapter.")).  Defendants are entitled to judgment in their favor with regard to Plaintiff's claim of assault.

### 3.    NEGLIGENCE REGARDING SEIZURE OF MEDICATION

Under Arizona law, to establish a claim for negligence, a plaintiff must prove four elements: (1) a duty requiring the defendants to conform to a certain standard of care; (2) a breach by the defendants of that standard by their actions or failure to act; (3) a causal connection between the defendants' conduct and the resulting injury; and (4) actual damages. *Gipson v. Kasey*, 214 Ariz. 141, 143, 150 P.3d 228, 230 (2007) (citation omitted).  "The proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred."  *Robertson v. Sixpence Inns of Amer., Inc.,* 163 Ariz. 539, 546, 798 P.2d 1040, 1047 (1990) (plaintiff must show some reasonable connection between defendant's act or omission and plaintiff's damages or injuries).  The plaintiff bears the burden of proving the defendants' negligence by a preponderance of the evidence.  *Guardas v. United States,* 600 F.Supp. 2d 1059, 1063 (D. Ariz. 2009) (citing *Harvest v. Craig,* 195 Ariz. 521, 523, 990 P.2d 1080, 1082 (Ct. App. 1999)).

Plaintiff did not testify as to how often he took his blood pressure medication.  The Court has discussed in great detail, *supra,* the circumstances as to why Deputy Callahan-English took Plaintiff's medication.  Having obtained the medication sometime after 11:18 p.m. on August 7th, and after leaving Plaintiff in the care of the hospital sometime after 4:00 a.m., and then returning the medication to Plaintiff no more than 16 hours later[28], Deputy Callahan-English's actions were not negligent.  Although Plaintiff testified that he experienced a pounding a headache, which he attributed to high blood pressure, and that he was later found to have high blood pressure, he has not established any causal connection between this and his lack of access to the medication during the

---

[28] During some portion of this time period, Plaintiff was treated at the hospital and, then, held in a detention facility after his arrest by WPD. Given Fred Cleveland's report to Deputy Callahan-English that Plaintiff returned home around 2:30 p.m., the evidence suggests Plaintiff was home without his medication for approximately 5 to 5 ½ hours, although he did seek treatment at the hospital at some point during that time.

relevant period.   For example, in light of the fact that Plaintiff appeared heavily intoxicated, with blood shot eyes and slurring his words the previous night during his encounter with the deputies, the evidence suggests that his headache could just as easily have been attributed to a night of heavy drinking or to Plaintiff having repeatedly hit his head against the seat and partition in the patrol vehicles, rather than to high blood pressure.   Nor is there evidence that the amount of time that Plaintiff was without his medication would necessarily result in a spike in blood pressure.   Plaintiff has failed to establish any causal connection between Deputy Callahan-English's actions and any injury or actual loss or damage caused to him.   Judgment is entered in favor of Defendants on this claim.

**III.   JUDGMENT**

IT IS ORDERED that the Court's June 13, 2016 Minute Order is AMENDED to reflect that Defendants' oral motion for judgment as a matter of law made during trial is construed as a motion for judgment on partial findings under Fed.R.Civ.P. 52(c) and such motion is GRANTED in favor of all Defendants as to Plaintiff's claim under 42 U.S.C. § 1983 for violation of the Fourth Amendment based on excessive force.

IT IS FURTHER ORDERED that:

(1)   the Clerk of Court shall enter judgment in favor of Plaintiff in the nominal amount of $1.00 (one dollar) with regard to his claim pursuant to 42 U.S.C. § 1983 for unlawful seizure of his medication in violation of the Fourth Amendment; and

(2)   the Clerk of Court shall enter judgment in favor of Defendants Cochise County, Haymore, Cronin and Callahan-English with regard to all of Plaintiff's remaining claims.

Dated this 12th day of September, 2016.

_____
Bernardo P. Velasco
United States Magistrate Judge